UNITED STATES COURT OF APPEALS

**Filed 12/15/95**

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,              )
                                       )
          Plaintiff-Appellee,          )
                                       )
     v.                                )     No. 95-8007
                                       )     (D.C. No. 94CR-31)
GRADY LEWIS HAND, aka James Grady      )     (D. of Wyoming)
Lewis Hands, III, aka James G.         )
Hands, III, aka Major General          )
James Grady Lewis Hands, III,          )
                                       )
          Defendant-Appellant.         )

---

ORDER AND JUDGMENT[*]

---

Before BALDOCK, McWILLIAMS and REAVLEY,[**] Circuit Judges.

---

Grady Lewis Hand appeals his conviction by a jury of conspiracy to launder money and the trial court's order that he pay $699,760 in restitution. We affirm the judgment of conviction, vacate the order of restitution and remand the cause to the district court.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470.

[**] The Honorable Thomas M. Reavley, United States Court of Appeals, Fifth Circuit, sitting by designation.

Hand was charged along with Delton Olson[1] and the Cross brothers – Stewart and Stephen, in a multi-count indictment alleging wire fraud, mail fraud, and conspiracy to launder money all stemming from fraud related to a financial investment scheme. The conspirators operated through two entities – Cross & Associates and NorthStar Investment Trust. Hand was chairman of the board of Cross & Associates, a company solely owned by its president Stewart Cross. Stewart and Hand were initially involved in "self-liquidating" loans. While the exact nature of these loans is unclear, Cross & Associates was supposedly to obtain funds from these financial instruments in excess of 300 million dollars. These funds would later play an integral part in the conspirators' investment scheme.

In March of 1993, Olson and Stephen Cross began marketing a "roll program" through NorthStar.[2] This program was designed to provide small investors with the opportunity to invest or "piggyback" into the larger "roll program" being conducted by

---

[1]     Delton Olson has filed a related appeal, Docket No. 95-8006.

[2]     After a Securities and Exchange Commission inquiry into NorthStar's activities, Olson and Stephen Cross stopped soliciting investors in NorthStar's name. The two created a company called SLM which continued the investment scheme. Stephen and Olson substituted SLM agreements with the NorthStar management agreements that had been previously executed with the investors. The SLM agreements were backdated to coincide with the creation of the NorthStar "roll program." The investors were asked, but most refused, to return the old NorthStar agreements. The S.E.C. was then informed that no "roll programs" were in existence.

Cross & Associates.[3]  The investors were informed that Hand and Stewart were purchasing prime bank notes in the amount of 100 to 300 million dollars or more.  Cross & Associates, through their trader, would contract to purchase the notes at a discount from only the world's largest 100 banks.  Cross & Associates would also contract with an institution in the secondary market to purchase these notes.  This secondary market consisted of pension funds, insurance companies, and large corporations.  The actual "roll" or "tranche" occurred when Cross & Associates purchased the note from the bank with cash and then sold the note to the secondary market.  The difference between the purchase and sale of these instruments were to result in a substantial profit to Cross & Associates and their investors.  The investors were informed that because of bank and federal regulations the two parties were not able to deal directly with the other, thus creating the need for Cross & Associates.

To further insure that investors' monies were safe, Hand and Stewart Cross executed an assignment agreement on behalf of Cross & Associates to the investors, assigning the investors the rights to the 300 million dollars in "self-liquidating loans."  Olson assured the investors that their money was "guaranteed."  The money was to remain in a brokerage account unless it was out on a

---

[3]    All that we say about the planned operation of this investment program is based on what is gleaned from defendants' claims and not from supporting evidence for those claims.

3

"roll." When the money was out on a "roll" it was guaranteed through the assignment.

The roll program was non-existent. Investors were paid the two to four per cent per month return for their investment funds. The four conspirators looted much of the remaing money. In October the investment scheme was ended by federal officials. During the length of the conspiracy, Hand alone received approximately $449,000 of a total of 3.3 million dollars invested in NorthStar/SLM. A jury found Hand guilty, and the district court sentenced him to 97 months imprisonment and three years supervised release.

## I. Sufficiency of the Evidence

Hand challenges the sufficiency of the evidence to support his conviction. He argues the evidence does not establish that there was an agreement between the alleged co-conspirators to launder money or that money laundering occurred. We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could find Hand guilty beyond a reasonable doubt. United States v. Hanson, 41 F.3d 580, 582 (10th Cir. 1994).

Hand was charged with conspiracy to violate 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). Those sections provide:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
> > (A)(i) with the intent to promote the carrying on of specified unlawful activity; or

4

```
                     *    *    *
    (B) knowing that the transaction is designed in whole
    or in part--
         (i) to conceal or disguise the nature, the
         location, the source, the ownership, or the
         control of the proceeds of specified unlawful
         activity . . .
shall be sentenced to a fine of not more than $500,000 or
twice the value of the property involved in the transaction,
whichever is greater, or imprisonment for not more than
twenty years, or both.
```

The "specified unlawful activity" alleged in the indictment was mail or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

## A. The Conspiracy

The government proceeded under the basic theory that Hand and others conspired to violate § 1956(a)(1)(A)(i) or (B)(i). 18 U.S.C. § 1956(h). To prove a conspiracy, the government must prove: (1) the existence of an agreement; (2) to break the law; (3) an overt act; (4) in furtherance of the conspiracy's object; and (5) that a defendant willfully entered the conspiracy. Hanson, 41 F.3d at 582; 18 U.S.C. § 371. "While all five of these elements must be present, the essence of any conspiracy is 'the agreement or confederation to commit a crime.'" Id. (quoting United States v. Bayer, 331 U.S. 532, 542, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947)). In the present case there is no direct evidence of an agreement among all the parties; however, the surrounding circumstances are sufficient for a rational jury to conclude that Hand was a member of the conspiracy. Hand's representations to the investors, his role in duping them and appropriating large amounts of their money, and documents

5

recovered from Hand during the government's investigation of the conspirators' illegal actions all support the jury's conclusions.

Several of the investors believed that Hand's participation in the program was vital to its existence. This was due, in part, to Hand's representations to co-conspirators and others about his "high-placed" government contacts. Hand represented that he was a major general in United States Military Intelligence,[4] and that he was handling large sums of monies for the Central Intelligence Agency for covert operations. As a result of these contacts and his position, Hand was supposed to be knowledgeable about international finance and be able to consummate large financial transactions.

On April 19, 1993, Olson, the Cross brothers, and several investors of NorthStar met in Atlanta. The investors were informed that Hand was unable to attend in person but would participate via the telephone. During the phone conversation, Hand relayed that Cross & Associates was conducting significant "rolls" at that time. He also answered investor questions concerning the ongoing roll programs and the documentation of those programs. Hand responded that documentation would be

---

[4] In support of this, Hand produced his military "commission." Numerous individuals testified that the document was not real, and that generals were not covertly commissioned in this manner. Retired General Colin Powell, former Chairman of the Joint Chief of Staffs testified, through a videotaped deposition, that he did not know Hand and that generals were not commissioned in such a manner. In fact the stamp on the so-called "commission" was from the War Department, the predecessor to the Department of Defense.

provided; however, because of the secret nature of the transactions the documents could not be released until after the transactions were complete. Hand informed the investors that "[he] believe[d] we can structure [the roll program] as nearly risk-free as anything can be structured." Hand even discussed the decrease of credibility in some "roll programs" because of the apparently fraudulent actions of other individuals.

In June of 1993, Hand instructed Stewart Cross to summarize Hand's resume and provide it to Olson for the investors. Hand also assisted Stewart in producing materials for an investor meeting in Bellevue, Washington. These materials included Hand's "government" documents and his military "commission." The investors at that meeting were provided with a letter signed by Hand apologizing for his absence. (The letter was prepared at Hand's request by Stewart.) The letter also informed the investors that in the next two weeks 10 billion dollars would be transferred to Cross & Associates for Stewart's management. When Stewart returned to Atlanta, Hand requested that the letter be destroyed.

Hand also participated in critical aspects of the operation of Cross & Associates. Hand signed the initial letters of authorization for the transfer of the first $300,000 from the investors' account into various other accounts.[5] This $300,000

---

[5] Hand also argues in his brief that there is insufficient evidence to demonstrate that wire or mail fraud occurred. But as can be seen from these facts, Hand signed several letters of authorization in his capacity as chairman of

7

was termed a "loan" from the investors' account by Hand and the Cross brothers. However, the management agreements only permitted investor funds to be used for "rolls" or the money was to remain in the brokerage account. Hand also signed the assignment agreement between Cross & Associates and NorthStar. This assignment agreement was a crucial part of the guarantee offered to investors. This and Hand's other representations to investors were a critical part of NorthStar/SLM's success in raising the 3.3 million dollars.

Finally, the evidence also indicates that Hand was aware that the money he was receiving from Cross & Associates was investor money. In December of 1993, investigators from the states of Georgia and Wyoming, the Internal Revenue Service, and the United States Post Office interviewed Hand at his motel room in Atlanta. One of the documents presented to the investigators at that time by Hand was an investor list of the SLM program and how much each investor was owed. A copy of the assignment agreement was also recovered, as was a file entitled "Stephen T. Cross/Del Olson problem." This file contained various documents

the board of Cross & Associates which authorized the wire transfer of monies from the investor brokerage accounts to other accounts. These transactions were termed "loans" by the co-conspirators, but a reasonable juror could have rejected this explanation.

One investor who knew Hand testified that he invested in NorthStar/SLM because Hand was running the larger "roll program." That investor had turned down other opportunities to invest in similar programs because he was not comfortable with the traders. The investor further testified that all four conspirators, including Hand, represented to him that these trades were actually occurring.

8

relating to SLM, Cross & Associates, NorthStar, and the grand jury investigations in Wyoming of NorthStar/SLM. This evidence supports the jury's conclusion that Hand was an active member of the conspiracy, and that there was an agreement beween Hand and the others to obtain investor funds through the false representations of the conspirators.

## B. Money Laundering

Hand also asserts that there is no evidence that money laundering occurred, that is, that he did not commit any transaction with the proceeds from the mail or wire fraud to either promote the carrying on of the mail or wire fraud or to conceal or disguise "the nature, the location, the source, the ownership, or the control of the proceeds" of the mail or wire fraud. See 18 U.S.C. §§ 1956(a)(1)(A)(I) (use of money for promotion of scheme) and 1956(a)(1)(B)(I) (commission of transactions to conceal proceeds of scheme). The evidence was sufficient under either theory.

Investor proceeds were used by Cross & Associates to create the "aura of legitimacy" and bolster the credibility of the principals with the investors. United States v. Johnson, 971 F.2d 562, 566 (10th Cir. 1992). The Cross & Associates offices were in the Atlanta Financial Center. Both Hand and Stewart Cross negotiated a new company lease after investor funds began to arrive. Hand also assisted in selecting new furniture for the company. Several investors testified that they were impressed with the Cross & Associates offices during the April meeting.

9

The company also spent other funds for Hand's business expenses, like his mobile phone, to further facilitate his pretended financial dealings in the international community. The evidence supports a jury conclusion that Hand was aware of and authorized the expenditure of investor funds through Cross & Associates to continue to promote the non-existent "roll program."

Even more compelling is the alternative ground of concealment which was presented to the jury. Several transactions evidenced Hand's motive to conceal his appropriation of funds from the financial scheme. The most glaring example concerns the Cross & Associates' financial statement. Stewart instructed the accountant (per Hand's instructions) to show Hand's receipt of investor funds as a short term investment. The Cross & Associates balance statement listed $494,071.71 which had been paid to Hand as a short term investment in "PFA INTL." The importance of creating a legitimate purpose for these funds was demonstrated by Hand's own representations to the investors in April. At that meeting, Hand specifically outlined how the investors' money was secure because the money was either being used for a "roll" (at which time the assignment covered the monies) or it was in the brokerage account. Listing the money as a short term investment in "PFRA INTL" gave the appearance that this money was out on a "roll." However, the $494,071.71 was not an investment of any kind, but rather business and personal expenses of Hand.

To further legitimize the use of investor funds, Hand also executed several loan agreements between himself (personally or through his corporation) and Cross & Associates. These loans were structured to appear to give Cross & Associates a tremendous payout in a relatively short time period. This evidence could support a juror's conclusion that Hand and the conspirators' actions were designed to conceal the nature of their illicit gains through the mail and wire fraud.

## II. Testimony of "General" Ferrara

Hand argues the trial court erred in failing to compel Ferrara to testify or in failing to require Ferrara to invoke the Fifth Amendment before the jury. Ferrara was allegedly one of Hand's high placed government contacts who was a liaison between the Mexican and American governments. Hand delivered a total of $215,000 in cash to Ferrara in three separate installments at the Orlando airport during the summer of 1993. During Hand's trial, Ferrara was awaiting trial for alleged wire fraud and securities violations not related to the instant offense. After examining Ferrara and his attorney, the district court declared Ferrara unavailable for purposes of Fed. R. Evid. 804.

Ferrara was clearly entitled to invoke the Fifth Amendment privilege of self-incrimination. Any admission concerning the receipt of funds by Ferrara from Hand because of Ferrara's fraudulent representations could have constituted a federal or state crime. The privilege is to be liberally construed in favor of a witness. Hoffman v. United States, 341 U.S. 479, 486, 71

11

S.Ct. 814, 818, 95 L.Ed. 1118 (1951); United States v. Hart, 729 F.2d 662, 670 (10th Cir. 1984), cert. denied, 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985). Additionally, a defendant has no right to force a witness to invoke the privilege in front of a jury. Hart, 729 F.2d at 670. Therefore, the district court did not err in refusing to compel Ferrara to testify or to force Ferrara to invoke his privilege in the presence of the jury.

### III. Restitution

Finally, Hand asserts the trial court erred in ordering Him to pay $699,760 in restitution. The government agrees. The parties note that Hand presently is in debt for 5.77 million dollars, has little if any assets, and has a negative monthly cash flow of $3,854. The evidence is equally unclear whether Hand has the earning potential to pay restitution in the future. See United States v. Kunzman, 54 F.3d 1522, 1532 (10th Cir. 1995) (lack of financial resources is not a bar to a restitution order if the evidence indicates the defendant has some assets or the earning potential to pay the amount ordered). Therefore, on this record the district court abused its discretion in determining the amount of the restitution ordered.

The judgment of conviction is AFFIRMED, the order of resitution is VACATED, and the cause is REMANDED to the district court.

12

Entered for the Court

Thomas M. Reavley
Circuit Judge