Freddy FLONNORY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 358, 2004.

Supreme Court of Delaware.

Submitted: Nov. 7, 2005.

Decided: Feb. 1, 2006.

Brian J. Bartley (argued) and Nicole M. Walker, Office of the Public Defender, Wilmington, Delaware for appellant.

Thomas E. Brown and Gregory E. Smith (argued), Department of Justice, Wilmington, Delaware for Appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court *en banc.*

STEELE, Chief Justice.

On July 13, 1997, Freddy Flonnory and his co-defendant Korey Twyman shot and killed Angela Farmer and Danya "Duke" Adams. Flonnory was indicted, tried, convicted of first degree murder as well as other crimes, and sentenced to death in October 1998. He appealed to this Court. On August 14, 2001, we reversed and remanded to a different trial judge for a new trial because one of the jurors in the first trial communicated highly prejudicial information to the other jurors, and thus violated Flonnory's right to a fair trial by an impartial jury under both the Delaware and the United States Constitutions.[1] In February 2004, a jury again convicted Flonnory. After conducting a penalty hearing, on July 22, 2004, the Superior Court judge found that the mitigating factors outweighed the aggravating factors and sentenced Flonnory to life in prison on both first degree murder convictions, to a third term of life imprisonment for the attempted murder conviction, and to a total of 60 years incarceration on the remaining convictions. Flonnory again appealed to this Court. He raises eight issues on appeal. Because we find that the trial judge acted within his discretion and that any errors he made were harmless beyond a reasonable doubt, we affirm the trial judge's rulings and Flonnory's convictions.

### *Facts*

The July 13, 1997 double homicides were the culmination of a long-standing feud between Twyman and Richard Grantham. The feud began on Christmas day in 1996. During that time, both Twyman and Grantham were incarcerated at the Ferris School. Grantham, who had behavioral problems, was normally isolated from the general inmate population. On that Christmas, however, he was allowed to eat with the general population. Twyman and other inmates at Twyman's table apparently gave Grantham mean looks and made threatening gestures towards him. Grantham responded by throwing a food tray at Twyman, spilling juice on him. While the guards restrained Grantham, Twyman calmly and coolly informed Grantham that "it was not over" and that "he would get him [Grantham] in the world." The feud continued after Grantham and Twyman were released from the detention facility.

On July 1, 1997, Flonnory, who was then 18 years old, Twyman, who was then 15, and several others, were "hanging out" in the street in Bethel Village when Grantham drove by in a car with Dwayne Warren and Danya "Duke" Adams. While the car was stopped at a red light, Grantham saw Twyman, Twyman's brother Terrell, and Flonnory nearby. Twyman picked up

---

1. *Flonnory v. State,* 778 A.2d 1044 (Del.2001).

a bottle and threw it at Grantham's car. Grantham drove off through the red light to the west side of Wilmington, where Adams retrieved his handgun.

After getting the handgun, Grantham, Adams, and Warren drove to the area of 24th and Market Streets. Twyman, who by this time had returned to this area, spotted Grantham in the car. Twyman and several others, including Flonnory, approached the car. Twyman then struck Grantham in the head with a bottle while Grantham was being pulled from the car. Adams responded by firing several shots into the group that gathered around the car. One of the shots struck Twyman in the arm. Another shot passed through Flonnory's clothes, barely missing him but leaving him unharmed. A third shot hit a car belonging to Flonnory's mother that was parked near the intersection. Several of Flonnory's nieces and nephews as well as his girlfriend were sitting in the car at the time of the shooting. When the Wilmington police arrived at the scene, neither Flonnory, Twyman, nor Flonnory's relatives informed the police that Adams was the shooter.

For the next several weeks, Twyman expressed a desire to retaliate against Adams and the "westside boys" for the shooting. On July 13, 1997, Flonnory and Twyman decided to seek revenge for the July 1 shooting. Shortly before midnight, Twyman and Flonnory got a ride to the west side of Wilmington with Lionel "Moose" Robinson. Robinson was a "gypsy," an un-licensed taxi-driver, who gave rides in his red Chevrolet Cavalier in exchange for money or drugs. After circling the area around 6th and Madison Streets, Twyman spotted Adams and instructed Robinson to park at 6th and Washington

Streets. Twyman and Flonnory left the car and asked Robinson to wait for them to return. The two then proceeded through an alleyway and entered the 600 block of Jefferson Street.

Danya "Duke" Adams, Dwayne Warren, Deshawn "Dewey" Scott, and Angela Farmer were seated on chairs and on an old television set in the road near the intersection of 6th and Jefferson Streets. The four heard shots fired. They realized that they were the target of those shots when they observed sparks from bullets hitting the ground near them. Farmer, who was 17 years old at the time, was hit three times and fell dead from a fatal shot to the chest. Dewey managed to flee the scene. Adams, who was 18 years old, was struck by two bullets. Warren, after being struck by two bullets in the leg, tried to carry Adams behind a car after Adams had been shot. Adams' injuries, however, turned out to be fatal. Additional facts relevant to each of the eight issues Flonnory appeals will be set forth in the section discussing these issues.

### 1. Admission of Akhee Flonnory's § 3507 Statements

Before trial Flonnory moved for an Order precluding the State from introducing pursuant to 11 Del. C. § 3507,[2] any out-of-court interrogations, conversation, dialogues and/or declarations reportedly involving Akhee Flonnory [Freddy Flonnory's brother]. In an order dated January 14, 2004, the Superior Court judge granted the motion in part and denied it in part. During the course of the trial, the State called Akhee Flonnory to testify. Akhee took the stand and was a hostile witness. Before ending Akhee's direct examination, the State called Wilmington police Detec-

---

2. § 3507 provides, "In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."

tive Liam Sullivan, through whom the State introduced a videotaped police interview of Akhee. The State also introduced several other out-of-court statements Akhee had made to the police.

Flonnory claims that Akhee's statements were double hearsay and were inadmissible because they were not based on personal knowledge, but were based on (1) newspaper accounts, (2) out of court statements made by Twyman, (3) out of court comments of other parties and (4) Akhee's conjectures. Flonnory also claims that the admission of Akhee's hearsay statements deprived him of his constitutional right to confront and cross-examine his accusers and his right to a fair trial. We refer to the three statements as the August 12, 1997 Statement, the September 22, 1998 Statement, and the September 24, 1998 Statement.

▆▆▆▆ We review a trial judge's refusal to grant a defendant's motion to suppress evidence for an abuse of discretion.[3] Similarly, our review on a ruling on the admissibility of a § 3507 statement is for abuse of discretion.[4] Thus the trial court's judg-ment is reversible only if we find that the decision to admit the § 3507 evidence was clearly erroneous.[5] We review an alleged constitutional violation relating to a trial court's evidentiary ruling *de novo.*[6] We note, before specifically discussing each statement, that in three letters to the trial judge the parties presented their interpretations of Akhee's answers to interrogator's questions and substantial quotations from the transcripts of these statements. We also note that the trial judge did not admit the majority of the August 12, 1997 statement because it was double hearsay with no applicable exception.

### a. The August 12, 1997 Statement

In his January order the trial judge determined which of Akhee's answers were admissible on a question by question basis.[7]

### *Answer 34* [8]

▆▆▆▆ The trial judge ruled that Answer 34 was admissible. In A34, Akhee uses the vague pronoun reference "they" before repeating what "they" told him. Before

3. *Purnell v. State,* 832 A.2d 714, 718 (Del. 2003) (citing *Woody v. State,* 765 A.2d 1257, 1261 (Del.2001)).

4. *Johnson v. State,* 878 A.2d 422, 427 (Del. 2005).

5. *Purnell* at 718.

6. *Johnson* at 427 (citing *Hall v. State,* 788 A.2d 118, 123 (Del.2001)).

7. In a letter to the trial judge, the prosecutor explained how these questions became those at issue in the Order:

Dear [Trial Judge]:
As indicated in a recent office conference, the State and defense counsel previously met, albeit unsuccessfully, in an attempt to come to an agreement as to the admissibility of certain portions of Akhee Flonnory's various statements to the police. Defense counsel has argued in previous filings, inter alia, that the Akhee Flonnory statements to the police are all inadmissible hearsay since they are not based on the witness' personal knowledge. The State indicated at the recent office conference that we would identify those portions of the Akhee Flonnory statements that are from his personal knowledge, or directly from Freddy Flonnory and therefore not inadmissible hearsay....

8. A portion of A34 follows:
Akhee: And they say ah, one dude was running they chased him to his, I don't know if it was a dude, oh yeah it was a dude cause they said his girl fell right at the table, it was a dude they chased one dude towards, towards... start shooting him in the ditch. That's all that happened, (CU), then, and then after they told me I said, "Box [Flonnory's nickname] what the fuck are you doing?" He said, "Man I don't care, forget that man I'm a die anyway, I'm ready to die."

the trial judge, the State argued that A34 was based on a discussion about the murders Akhee had directly with Flonnory. The defense responded that the only discussion between the Flonnory brothers alluded to in A34 concerned what Freddy intended to do after the shootings occurred. Flonnory also argued that there was nothing in A34 to indicate that the initial referent "they" was Freddy Flonnory. The trial judge found otherwise. We find no abuse of discretion in the trial judge's decision to admit A34. The trial judge, apparently found that "they," included Flonnory. We will not disturb that ruling on appeal.

■ Akhee's out-of-court § 3507 statement telling the interrogator what Flonnory told him was "hearsay within hearsay." [9] "If double hearsay is being offered into evidence, each aspect must qualify *independently* as an exception to the hearsay rule." [10] In this case, Akhee's statement is not inadmissible double hearsay. Under D.R.E. 801(2)(A) an admission by a party-opponent is not hearsay. Thus, Flonnory's statements to Akhee, the hearsay within hearsay, are admissible. Moreover, Akhee was present at trial and defense counsel had the opportunity and did cross-examine him, thus the hearsay portion of Akhee's statement quoting Flonnory is admissible under 11 Del. C. § 3507.

### Answers 56–62 [11]

■ The trial judge ruled that Answers 56–62 were admissible as they were based on Akhee's personal knowledge. Before the trial judge the State argued that this excerpt established that Flonnory used a .357 that Akhee knew by his own personal knowledge that Flonnory hid near his grandmother's house. The defense argued that "nowhere within this excerpt does Akhee say that he ever observed Freddy use a .357 or that he observed Freddy hide or otherwise be in possession of a .357." Accordingly, the defense argued, the State's suggestion that this excerpt established that Akhee had personal knowledge that Flonnory used a .357 and that this was the gun regularly hidden near his grandmother's house was unsupported. The trial judge admitted these answers on the basis that they were from Akhee's personal knowledge. Akhee may have had personal knowledge about where Flonnory stashed his gun and about the fact that Flonnory used a .357 and the trial judge could have so found. We cannot conclude

---

9. *See Demby v. State,* 695 A.2d 1152, 1162 (Del.1997); D.R.E. 805: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

10. *Id.*

11.
Q56: Okay, Korey used that gun for the shooting up there against the Westside boys, Duke and the girl?
A56: .9 millimeter and the .357 or A mag.
Q57: Okay .9 millimeter is what, an automatic you said?
A57: I don't know, I know a .357, (CU)(CU)(CU)(CU) with the barrel just turn around.
Q58: (CU)(CU)(CU) ...
A58: Yeah, that's what that is.
Q59: Who had that gun?
A59: My brother.
Q60: Okay, I just wanted to get that straight ah, you said Box [Flonnory] had the .357?
A60: Um hum.
Q61: Korey had the .9 and did Box ever tell you what he did with the .357?
A61: Nope he got locked up to [sic] quick....
Q62: You never talked to him about that?
A62: Nope, I ain't seen him (CU)(CU) since he been locked up or nothing. I ain't called to talk to him or nothing, all I know he used to hide the gun at my Grandma house in the trash can. (CU)(CU) ... his gun, (CU)(CU) what's his name bought um, Korey's gun for $175.00

that the trial judge abused his discretion by admitting these statements.

### Answers 65–67 [12]

■ The trial judge admitted Answers 65–67 because they related to both Tywman and Flonnory saying that they shot one of the victims. Akhee clearly states that both Korey and Flonnory said they shot one of the victims. This exchange was admissible for the same reason that A34 was admissible. Flonnory's statement was not hearsay under D.R.E. 801(2)(A) and Akhee's statement quoting Flonnory's statement was admissible under 11 Del. C. § 3507. The trial judge did not abuse his discretion in admitting this evidence.

### Answers 137–147 [13]

■ To understand why the trial judge admitted these answers, it is first necessary to elaborate certain facts. On December 30, 2003, the trial judge denied the defendant's motion to exclude a statement made by Joy Watson, Akhee's girlfriend, to FBI Agent Stranahan. The defense argued that Watson's statement was inadmissible as "interpretative narrative." (See below). The State then sought to admit Akhee's answers 137–147 to corroborate that Watson was present at 24th and Market shortly before the shooting. With respect to Akhee's statements, the defense argued to the trial judge that the excerpt did not establish that Akhee had personal knowledge that Joy Watson was present or

---

12.

Q64: Did any of them tell you that they [sic] was the ones that actually hit the girl?
A64: Nope, nobody really say.
[Q64 and A64 are only provided for context]
Q65: How about the guy? Yo[u] said they got him in the ditch?
A65: Yeah, then ah, you know he told, we shot the mother fuckers up, they ain't say who hit who, cause none of them ain't got no aim, ain't nobody no professional shooter.
Q66: Alright, (CU) none of us are, but who was actually saying they shot the mother fuckers up?
A66: Both, my brother and Korey, they was the only two there.
Q67: Okay, so they're both saying they shot?
A67: Um hum, somebody, one...they shot somebody out of the three that fell.

13.

Q134: Were you out there then?
A134: Yeah I was out there.
Q135: So you were there whenever they were talking about going...
A135: Yep...
Q136: To do the shooting, what were they... who was there when they was talking about that? Right before they left for the shooting?
A136: I don't want to put everybody name involved in it, cause some (CU)(CU) to um...

[The trial judge did not admit A132–134 because they were irrelevant, confusing and potentially unfairly prejudicial; and apparently did not admit A135 or 136]
Q137: I mean...
A137: Well I'll just put my name, I can put my girlfriend name (CU)(CU)(CU)(CU)...
Q138: Who?
A138: Joy, I use her cause she was there.
Q139: Joy?
A139: Yeah.
Q140: What's Joy's last name?
A140: Watson.
Q141: Okay, (CU)(CU) where does she live?
A141: You got the address where I live at?
Q142: Oh ah, I'm sorry that's up at Colony North?
A142: Yeah.
Q143: Hilltop, wherever you call it.
A143: Yeah.
Q144: And she was present when they talked about they were gonna go shoot these westside dudes? ·
A144: Um hum, but I don't know if she wanna talk, well if I talk to her and tell her she gotta speak up...
Q145: Okay, (CU)(CU) do the right thing...
A145: She probably speak up, but ya'll come around her...
Q146: Yeah.
A146: She play the dummy role like anybody else.
. . .

that Freddy Flonnory told him that she was present. Again, while we may have found differently were we sitting as trial judges in the first instance, we must defer to the trial judge's findings. The defense clearly presented its argument about why the statements should not be admitted. The trial judge decided to admit the statements as "relevant to Joy Watson's statement." Questions 135 and 136 and Answer 135 seem to indicate that Akhee had personal knowledge that Joy was present before Flonnory and Twyman left for the shooting. We cannot conclude that the trial judge abused his discretion by admitting A137–147 on the basis that the answers were relevant to Watson's testimony, particularly given that the trial judge did not admit A132–134 because they were irrelevant, confusing and potentially unfairly prejudicial, and also apparently did not admit A135 and A136.[14]

### Answers 207–219 [15]

■ The trial judge admitted A207–219, but did not give a reason for doing so. The State argued that these answers were relevant to the voluntariness of Akhee Flonnory's "dry statement." The defense argued that the answers did not establish that Akhee's statement was voluntary. During trial Akhee repudiated the statements he made during interrogation. He claimed that the statements were not truthful because he was under the influence of drugs during the police interrogation and wanted to get out to get his drugs. He claimed that he was a drug addict who used "every day, all day" lied "to anybody and everybody." He stated, "I said a whole lot of bullshit to try to get me out of whatever I was in." Moreover, Akhee recanted his statements in an Affidavit he sent to the prosecutor in 2002. We cannot say that the trial judge abused his discretion in admitting A207–219. Akhee was a turncoat witness who testified that he lied about everything he said to the prosecutors and that he was under the influence of drugs at the time he made the statement. It was not error to admit this portion of Akhee's statement.

### b. September 22, 1998 Statement

■ By order dated January 14, 2004, the trial judge admitted into evidence

---

14. In its letter to the trial judge, the State pointed to A132–136 as being admissible. In his order the trial judge did not admit A132–134 and did admit 137–147. The Order does not mention A135 and A136 either way. Given the context, however, it appears that the trial judge did not admit these answers.

15.

Q207: ...Um, Akhee you're not ah, being treated for any like mental illness or anything like that, you're not nothing like that?
A207: No, Man!
Q208: I know, I gotta ask you that, ah the other thing is you're not high or under the influence or anything like that?
A208: (CU)(CU)(CU), no.
Q209: Okay, how long have you been here today?
A209: Man I think about 11:00, 10:00
Q210: Sine 7:01, you've been here eight hours?

A210: Yeah, (CU)(CU)(CU)
Q211: I'm sure you're hungry man, I'm (CU)(CU)(CU).
A211: You know I'm just ready to get up out of here, (CU)(CU) (CU)(CU)(CU)(CU)(CU)
Q212: We're gonna try and (CU)(CU)(CU). (CU)(CU) a long time man, and you just met his guy here, but just for the record, you know Detective Sullivan and this is Special Agent Tim Stranahan with the FBI. Um, I mean for the record has anyone forced you or made you give a statement or anything like that?
A212: No, ain't nobody put a gun to my head and tell me to do nothing.
Q213: Okay, I just want to make sure (CU) that everything that you're saying is on your own ah...
A213: By my own free will...
...

three pages of handwritten notes taken by Lieutenant Dunning from an interview with Akhee Flonnory. The notes indicated that during the conversation, "Akhee advised [that] Freddie told him everything, not the night it happened but maybe one to two days later." The defense argued to the trial judge that the State had previously conceded that "almost the entirety of the August 12, 1997 interview was based on hearsay knowledge." The defense continued:

> [w]ith two prosecutors present during the September 22... interview...the prosecutors and chief investigating officer fail[ed] to memorialize the hearsay and nonhearsay aspects of Akhee's Flonnory's information. Thus, the notes are inexcusably unrecorded by tape. More importantly, they fail[ed] to delineate in any fashion, the bases for the statements made by Akhee during the interview.

As the trial judge implicitly found, this argument is without merit. The notes clearly indicate that Akhee's statements were based on what Flonnory told him. Accordingly, the trial judge did not err in admitting the notes. Again, Flonnory's statements to Akhee were not hearsay under D.R.E. 801(2)(A) and Akhee's out-of-court statements to the prosecution were admissible under 11 Del. C. § 3507.

### c. September 24, 1998 Statement

By the same order of January 14, 2004, the trial judge ruled that the Statements in the September 24, 1998 audio tape were admissible. Again the defense argued to the trial judge that the statement was replete with responses by Akhee that made "it clear that Freddy Flonnory was not the source of his information." While the defense's argument is at least a plausible interpretation of portions of the statements, other portions of the statement strongly support the State's argument that Flonnory told Akhee the majority of the information Akhee relayed to the interrogators.[16] In many cases, the interrogator

16.

Q1: Okay and um so it's just you and Freddie?
A1: Um...
Q2: And what did he say to you about what happened?
A2: I was askin' him man again you don't got to lie to me. I already know, Korey done already told me. I already know, where you goin', whatcha (CU), I just called him stupid then...
Q4[sic]: Tell me the truth.
A4: Yeah.
Q5: What did he say?
A5: He was like yeah well [mumbling] (CU). (CU) stop lyin', tell me what really happened. He said he got dropped off, they rode around the block a couple of times and didn't see nobody so they went back around the block again, seen 'em, parked in some alleyway, Korey got out first, then he got out and Moose stayed in the car, that was it.
...
Q8: So Freddie said he had a gun?

A8: Yeah, so (CU).
Q9: What did Freddie tell you he did? Did he say he intended to shoot the girl?
A9: Nah he ain't say all that.
Q10: What did he say happened?
A10: 'They just went over 'ere, I told 'em Korey was like he had good aim, and all this and my brother, Box, he was just ah shootin' all kinda ways and stuff.
Q11: So when he came out of the alley, he just started shooting?
A11: Yeah.
Q12: Freddie did?
A12: Yeah. They said you know Korey said he was shootin' all wild and everythin'.
Q13: Then did Freddie tell you that he was shooting?
A13: Not necessarily but know what I mean, I know he wasn't he didn't really come out and say it, but I already know, know what I mean. I know everythin' about it.
Q14: Well you're telling me that Freddie told you that he took the gun...
A14: Yeah.
...

asked Akhee if Freddie told him something and Akhee responded in the affirmative. In other cases, Akhee said that "they" or "all 'em" said something. Given the context, the "they" or "all 'em", as a factual matter, could include both Flonnory and Twyman. Akhee's statement was, thus, in large part admissible under D.R.E. 801(2)(A) and § 3507. While we may have found differently had we been the finder of fact in the first instance, we will not disturb the trial judge's factual findings absent an abuse of discretion.

 However, some portions of the September 24, 1998 Statement were inadmissible. In answers A38 and A39, Akhee said that Korey said something. The State argues that the co-conspirator exception [17] to the hearsay rule applies generally to statements Twyman made to Akhee because (i) Akhee accompanied Twyman on the majority of the trips Twyman took after the incident while trying to evade law enforcement, and (ii) during those trips Twyman made statements to Akhee about the homicides. This argument is misplaced. Akhee was not part of the original conspiracy. Even if he did accompany Twyman on the "majority" of these trips and made statements about the homicides, the co-conspirator hearsay exception would not apply. The defense correctly notes that:

> whatever conspiracy existed between Flonnory and Twyman ended on the same night as it began no later then, when, [in the State's words], "...Robin-

Q37: So Freddie didn't tell you how many shots he fired? But he said he was shooting in just all directions?

A37: Yeah.

Q38: Ah did he say that he... what he say when he got out there? I mean did he see the people?

A38: Korey, Korey said (CU) that's all I know that's (CU).

Q39: Korey said that?

A39: Yeah.

Q40: What did Freddie say about that, what they were doing?

A40: Nothin', he act like he had amnesia, he don't' really know too much, but he just knew he was shootin' all stupid.

...

Q50: Right, and he and his girlfriend, Joy Watson, Box, Korey, and Tirrell were talking. Box had asked Tirrell if he was scared. Tirrell said "Yes." Box asked Korey if he was scared if he was ready and he said, "Yes." And so Box, Korey... you said Box, Korey were under the influence of drugs at the time and in order to get over to the Westside, Box, Korey got a ride from Moose in a red Chevy Cavalier in exchange for a rock or two of cocaine. Is that right?

A50: Yeah.

Q51: Okay you saw that?

A51: Nah I ain't seen nothin'. I ain't seen that. I had to go by what I heard (CU).

Q52: Who'd you hear that from?

A52: I heard it from Rell, all'em. I heard it from all'em but I don't know what Joy was at then.

...

Q102: But Korey actually told you he was there and shot, (CU) did he say he shot the boy?

A102: Nah they ain't say who shot who or who did what. They were just shootin'.

Q103: Okay so they're both shooting?

A103: Yeah.

...

Q120: Is that what happened the day Korey got shot? The car showed up for some weed or something and they ah they chased him around with some bottles? That's what another witness told us.

A120: That's probably Rell's story cause Rell was there, I wasn't (CU) home, I gotta phone call and I came over 'ere.

Q121: Okay, had you heard that before?

A121: Yeah, Yeah I heard that what you just said (CU).

Q122: From Rell or ah...

A122: Nah that was just you know talk on the street, from girls and all that.

17. D.R.E. 801(d)(2)(E) defines as not hearsay "a statement by a co-conspirator of a party [made] during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court."

son returned the two to 24th and Market Streets where Flonnory and Twyman bragged to their relatives and friends how they had used all of the ammunition to shoot up the block. . . ." Defendant and Twyman were not co-conspirators at the time of Twyman's statements to Akhee. . .[b]ecause the[ir] conspiratorial objective was accomplished.[18]

More importantly, as the defense notes, it does not appear that the trial judge actually relied upon or even mentioned this exception to the hearsay rule in admitting any of Akhee's answers. Accordingly, it was error for the trial judge to admit portions of Akhee's September 24, 1998 statement where Akhee recounted what Korey said, because there was no hearsay exception for Korey's hearsay within hearsay statement. It was also error for the trial judge to admit A120–A122, where the "girls and all that" appeared to be the source of Akhee's knowledge as there was no hearsay exception for the "hearsay within the hearsay." Nevertheless, we find these minor errors to be harmless beyond a reasonable doubt.[19] Accordingly, Flonnory's argument on this point of appeal fails.[20]

### Crawford

Finally, we note that the defense's *Crawford*[21] argument is misplaced. The majority of Akhee's out-of-court statements were either based on personal knowledge or hearsay statements that Flonnory made to Akhee. Because Akhee was present at the trial and subject to cross-examination, the admission of those statements did not deprive the defendant of either his right to confront or to cross-examine his accusers.

 Under Crawford, "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity

---

**18.** The State cites a Pennsylvania Supreme Court case, *Commonwealth v. Cull*, 540 Pa. 161, 173, 656 A.2d 476 (Pa.1995), for the proposition that "Although generally once the conspiratorial objective is accomplished, the out-of-court declarations of a conspirator cannot be used as evidence against his co-conspirators there are instances in which statements made after the perpetration of the target crime are admissible because they are so closely connected to the commission of the substantive offense that they may reasonably be considered part of a continuing course of criminal conduct emanating from the substantive offense." (citations omitted). We think that in the case at bar the general rule applies and not the exception. It is clear from the facts that the statements in this case were not part of a continuing course of conduct emanating from the substantive offense. To read the exception as broadly as the State urges would let the exception swallow the rule.

**19.** *See Van Arsdall v. State*, 524 A.2d 3, 11 (Del.1987).

**20.** The defense notes that at portions of the August 12, 1997 statement Akhee contradicts himself. More specifically, the portions of the statement the trial judge did admit contradict portions the trial judge did not admit. Indeed, Ahkee's August 12, 1997 contradicts parts of the September 22, 1998 and the September 24, 1998 Statements. At some points Akhee says that he did not talk with Freddy Flonnory, while at others he relates what Flonnory said or what Flonnory related to him. Akhee was an inarticulate witness who made separate statements that were internally inconsistent and inconsistent with each other. After the benefit of substantial arguments, the trial judge admitted certain statements. While we may have ruled differently had we been making the rulings in the first instance, we will not disturb the trial judge's ruling on appeal absent an abuse of discretion.

**21.** *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

to cross-examine."[22] Moreover, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."[23] Finally, statements a declarant makes to the police are "testimonial" under *Crawford*.[24]

In this case, the declarant, Akhee, was available to testify at trial. The defense had an opportunity to cross-examine him about his out-of-court statements. Furthermore, the vast majority of the admitted out-of-court statements were based either on Akhee's personal knowledge or, when they were double hearsay, were based upon the defendant Freddy Flonnory's statements to Akhee. To the extent that Akhee's statements recounted inadmissible hearsay (i.e., statements Korey made to Akhee or that Akhee heard from "Rell" or the "girls and all that"), given the weight of the evidence and the totality of the facts in the record, any *Crawford* error that resulted from the defendant being unable to cross-examine the out-of-court declarant was harmless beyond a reasonable doubt.[25]

### 2. Admission of Joy Watson's § 3507 Statement.

 During the course of his interview with the police, Akhee Flonnory suggested that the police interview his girlfriend, Joy

Watson. Thereafter, FBI Agent Stranahan interviewed Watson for approximately 35 or 40 minutes. As he did so, Stranahan took shorthand notes. Before trial, the defense filed a motion *in limine* seeking a ruling that Stranahan's proposed hearsay was inadmissible under § 3507 because it was his "interpretative narrative" rather than Watson's actual statement. The trial judge denied this motion stating: "the Court cannot conclude at this point that the Agent's rendition or recollection of Ms. Watson's statement, assuming a proper foundation is laid, will not comply with ... § 3507." During the trial, the State laid the foundation for Stranahan's testimony by questioning him about how he took his notes. In an oral ruling, the trial judge concluded:

> Based on what I have heard I don't think it comes close to being an interpretative narrative. What I heard the agent testify to was that he had written down words said by the person that he was interviewing, which gave him certain factual information that he thought was important to be recorded. 3507 does not require that there be a verbatim recordation of everything that is said by an interview to come into evidence. As the State has pointed out, even—and statements are permissible. Certainly in this particular case you

**22.** *Id.* at 59, 124 S.Ct. 1354.

**23.** *Id.* at 59 n. 9, 124 S.Ct. 1354. *See also Johnson*, 878 A.2d at 428–429 ("[W]hen a witness takes the stand at trial, and is subject to cross-examination, the traditional protections afforded under the Confrontation Clause are satisfied").

**24.** *Crawford* at 52, 124 S.Ct. 1354. (Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.")

**25.** *See United States v. Lore*, 430 F.3d 190 (3d Cir.2005) ("If evidence was admitted in contravention of [the defendant's] confrontation rights, we must consider whether the error was harmless beyond a reasonable doubt."); *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir.2004) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680–81, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) ("Confrontation Clause violations are subject to harmless error analysis, because 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.' "); *United States v. Lewis*, 144 Fed.Appx. 131, 133 (2d Cir.2005) ("In light of this evidence, we find the Crawford error harmless beyond a reasonable doubt.")

have a trained agent who wrote down those things that he felt was important and he says that they are the words of the witness and not his interpretation of the words. So I'm going to overrule the objection.

After the jury was brought back in, the State called Watson to the stand. In response to most of the State's questions, Watson responded that she could not remember. The State then called Stranahan as a § 3507 witness. Stranahan read verbatim the redacted notes he took from the interview to the jury. The prosecutor then asked Stranahan "if we can start from the top. In speaking with [Watson] can you tell us exactly what she was saying. [W]ith respect to the first line, what did she tell you?" The defense again objected that this was interpretative narrative. The trial judge overruled the renewed objection. We review a trial judge's decision on the admissibility of a § 3507 statement for abuse of discretion.[26]

■ The defendant's "interpretative narrative" argument derives from *Huggins v. State*[27], in which we discussed the former version of § 3507:

> The Statute does not distinguish between written and oral statements. The Statute admits as affirmative evidence "the voluntary out-of-court prior statement of a witness". *It is the statement of the declarant that is being admitted, not the interpretative narrative of the person who heard the statement.*

Care should be taken to guarantee that the Statute is not abused by permitting a witness, such as a police officer, to embellish the prior statement by his own interpretation, even if the embellishment is made in the utmost good faith. Obviously, the best protection in this regard is a written statement. In the case of oral statements, the best safeguard would seem to be in foundation questions establishing the time, the place and the person to whom the statement was made. These are the traditional safeguards in treating a witness fairly when impeaching him by a prior inconsistent statement. It would seem that no less a standard should be required for evidence having "substantive independent testimonial value."[28]

As we have previously noted, "the *Huggins* case established that great care should be taken to avoid the embellishment of out-of-court statements which are the subject of testimony at trial."[29] Despite the defense counsel's question to Stranahan on cross-examination—"would it be fair to say that your notes or interpretive [sic] were an interpretive—narrative of what [Watson] said to you that evening,"—and Stranahan's answer—"Maybe somewhat,"—we still cannot find that the trial judge abused his discretion by admitting the evidence. "Interpretative narrative" is a legal term of art in Delaware, one with which Stranahan was unfamiliar when he responded to the defense counsel's question. The trial

**26.** *Johnson*, 878 A.2d at 427.

**27.** 337 A.2d 28 (Del.1975). *See also State v. Scott*, 1989 WL 90613, 1989 Del.Super. LEXIS 291 (Del.Super.Ct.1989) ("In [Huggins]the Supreme Court was critical of testimony offered by police officers as to the substance of statements made by a codefendant of Huggins while the codefendant was in custody. The Supreme Court was concerned that the officer's paraphrase of the codefendant's statement might be colored by bias and that the

police officers had the capacity to reduce such statements to writing or to take careful notes of precisely what was said in oral statements.")

**28.** *Id.* at 29–30. (citations omitted) (emphasis added).

**29.** *Garris v. State*, 550 A.2d 34 (Del.1988) (order).

judge, who was intimately familiar with the facts of the case, could assess the demeanor of the witness, and could determine more accurately than we whether the witness was testifying to the "words of the [declarant] and not his interpretation of the words." The trial judge in this case clearly took great care to avoid the embellishment of Watson's § 3507 statements introduced at trial. Stranahan's answer to the defense counsel's question notwithstanding, the trial judge made a factual finding that Stranahan wrote down the "words said by the person that he was interviewing, which gave him certain factual information that he thought was important to be recorded." Accordingly, the trial judge did not err by admitting Watson's statement.[30]

### 3. *Admission of Audio and Video Taped Recordings of § 3507 Statements as Trial Exhibits.*

■ We next consider Flonnory's contention that the Superior Court erroneously denied his motion made before trial to preclude the State from introducing at trial any exhibit that purported to "memorialize the voluntary out-of-court statement of a witness on the ground that any such exhibit, as opposed to in-court testimony concerning such statements, constituted inadmissible hearsay not within the legitimate scope of ... § 3507." In support of his motion, Flonnory urged the trial judge to adopt a strict construction of § 3507, to "authorize actual in-court testimony as to (or the playing of the recordings of) out-of-court statements as affirmative evidence...[but not] the further introduction of memorializations of the out of court hearsay statements as exhibits."

■ In an oral ruling, the trial judge denied this motion, citing the best evidence rule and noting that the tape was "actual substantive evidence" and that the jury was "entitled to see it like any other evidence that's admitted; such, as photographs, maps, [and] written documents...." The State then introduced several video and audio taped exhibits of § 3507 witnesses, as well as police officers' notes of witness interviews.[31] We review a trial judge's decision to admit a written or recorded § 3507 statement as a trial exhibit for an abuse of discretion.[32]

**30.** We emphasize that the State can easily avoid litigating the "interpretative narrative" issue by taking a written statement or an audio or video recording of a declarant's testimony. In the event that the State wishes to introduce the declarant's statement under § 3507 at a later trial, the writing or recording will easily and accurately present the declarant's words without embellishment. This is not to say that a police officer's handwritten notes and recollection of a declarant's statement can never be introduced under § 3507, only that a trial judge should use great care to ensure that a police officer's testimony—or that of any witness—about a declarant's out of court statement is an accurate representation of that statement and not an embellishment or an interpretative narrative.

**31.** The State did not, however, offer into evidence the transcripts of the various audio and video tapes. The transcripts were only available when the tapes were played in Court as a tool to assist the jury in understanding the recordings. The trial judge cautioned the jury that it was the jury's own understanding of the tape as they heard it, and not the transcription, that controlled the contents of the § 3507 statements.

**32.** *See Cousins v. State*, 2004 WL 1097700, 2004 Del. LEXIS 215 (Del.2004) (order) ("Physical evidence admitted against a defendant at trial is appropriately submitted to the jury during its deliberations at the judge's discretion."); *Johnson v. State*, 878 A.2d 422, 424 (Del.2005) ("we find no abuse of discretion in the admission of the exhibit."); *See State v. Jennings*, 815 S.W.2d 434, 440 (Mo. Ct.App.1991)("The decision whether to allow exhibits to be taken to the jury room is a matter of discretion for the trial judge"); *Brooks v. Holtz*, 661 N.W.2d 526, 532 (Iowa

On appeal, Flonnory again urges us to adopt a construction of § 3507 that would permit either (1) in-court testimony about the out-of-court statement or (2) the playing of the recording of the statement, *but not* the introduction of the statement as a separate trial exhibit that the jury could take with them into the jury room during deliberations and replay numerous times. He relies on *Taylor v. State.*[33] In *Taylor,* during jury deliberations, the foreperson of the jury orally requested the bailiff to provide a transcript of the defendant's testimony. The bailiff did not take the request seriously and did not pass it on to the trial judge, in part because the bailiff thought the foreperson was joking. The jury resumed its deliberations and never submitted a written request to the trial judge as they had previously been instructed to do. For reasons not disclosed in the record, during the penalty phase of the trial, the bailiff came forward and informed the trial judge of this incident. The trial judge met with counsel and had the bailiff describe the incident under oath. After hearing the bailiff's testimony, defense counsel moved for a new trial on the grounds that the communication between the bailiff and the jury prejudiced Taylor. The trial judge denied the motion, finding that the error was harmless because the judge would have denied the jury's request for a transcript even if proper procedure had been followed.[34] We affirmed the trial judge's ruling, accepting the trial judge's rationale that when a jury request for a transcript of testimony is denied, it is usually because: (1) the request may slow the trial where the requested testimony is lengthy; and, (2) when reading only a portion of the entire trial testimony, the jury may give undue emphasis and credence to that portion of the testimony and may fail to consider the trial testimony as a whole.[35]

■ *Taylor* does not stand for the proposition that a trial judge may never introduce a transcript of the in-court testimony of a trial witness as an exhibit. A trial judge has "broad discretion in determining whether, and to what extent, a jury in deliberation should be permitted to rehear testimony."[36] The trial judge has broad discretion to allow a jury to rehear testimony in any form, (e.g., having the court reporter reread portions of the testimony[37] or having transcripts of testimony prepared). It follows that the trial judge has broad discretion to admit as exhibits (that go into the jury room during the jury's deliberations) tape or video recordings or other "memorializations" of a § 3507 witness's out-of-court statements that were properly played in the jury's presence during the course of the trial.

■ We caution, however, that admitting a witness's out-of-court written or recorded § 3507 statement as a trial exhibit that goes into the jury room during jury deliberations should be the exception rather than the rule. In practice, a non-§ 3507 appearing witness's testimony before a jury is rarely, if ever, transcribed and given to the jury during their deliberations. Similarly, a § 3507 witness's in-

2003) ("Submission of exhibits to the jury is a matter resting in [the] trial court's discretion.").

33. 685 A.2d 349 (Del.1996).

34. *Id.* at 350.

35. *Id.* at 350–351.

36. *Harrigan v. State,* 1997 WL 45084, *2, 1997 Del. LEXIS 29, *6 (Del.1997) (order) (citing *Ward v. State,* 1991 WL 181476, 1991 Del. LEXIS 311 (Del.1991)).

37. *See Id.* at **2–3, 1997 Del. LEXIS 29 at *7.

court direct testimony [38] and cross-examination testimony [39] is also rarely, if ever, transcribed and given to the jury. In the case where the proponent of a § 3507 out-of-court statement has no recording or written statement and, therefore, must prove the statement through the testimony of another witness who heard the § 3507 statement, that trial testimony is also unlikely to be transcribed and given to the jury. "[A]s a matter of practice, transcripts are not prepared absent a formal request in connection with post-trial proceedings." [40] Therefore, the potential delay in the trial to enable the transcripts to be prepared often militates against giving the jury transcripts of in-court testimony for their consideration during deliberation. Accordingly, it will almost always be within the trial judge's discretion to deny a jury's request for a transcript of a witness's statement.[41]

■ Like all other evidence, § 3507 evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, *or* by considerations of undue delay, waste of time or needless presentation of cumulative evidence." [42] As a general matter, recorded or written out-of-court § 3507 statements that are played or read during trial should not be admitted as separate trial exhibits that the jury can take into the jury room during deliberations when all other testimony—including direct and cross-examination testimony of a § 3507 witness, out-of-court § 3507 statements presented by a witness other than the § 3507 declarant, and testimony presented by non- § 3507 witnesses—are generally not admitted as separate trial exhibits in transcript form after the witness testifies in court. The reason derives from the concern we discussed in *Taylor*, that allowing the jury to have transcripts of trial testimony during their deliberations might result in the jury giving undue emphasis and credence to that portion of the testimony. That concern is equally applicable to written or recorded § 3507 statements that are admitted into evidence as separate exhibits after they have been heard in open court. Thus, we hold that the "default" rule is that written or tape or video-recorded § 3507 statements should *not* be admitted into evidence as separate trial exhibits that go with the jury into the jury room during deliberations although the statements may be played or read to the jury in the first instance during the course of trial [43] (pro-

---

**38.** *Keys v. State,* 337 A.2d 18, 23 (Del.1975) (In order to use an out-of-court statement under the former version of § 3507, the statute required the production and direct examination of the witness by the prosecution.); *Barnes v. State,* 858 A.2d 942, 944 (Del.2004) ("Statements offered under § 3507 must be offered before the conclusion of the direct examination of the declarant.")

**39.** § 3507 expressly provides that the witness whose out-of-court statements are being offered must be subject to cross-examination.

**40.** *See Harrigan* at \*\*2–3, 1997 Del. LEXIS 29 at \*7.

**41.** *See Harrigan* at \*2, 1997 Del. LEXIS 29 at \*6; *Taylor* at 350–351; *See also Brooks v. Holtz,* 661 N.W.2d 526 (Iowa 2003) (In a civil

case, the trial judge did not abuse his discretion in denying the plaintiff's request that a video tape of the accident scene that the jury had previously seen be sent in with the jury during its deliberations because the trial judge clearly thought that doing so would overemphasize this evidence.); *State v. Baumann,* 236 N.W.2d 361, 366 (Iowa 1975) (Upheld trial court's decision to withhold audio tape recordings from the jury during its deliberations, even though the jury had requested the opportunity to listen to the tapes during its consideration of the case.).

**42.** D.R.E. 403.

**43.** *See State v. Jennings,* 815 S.W.2d 434, 440 (Mo.Ct.App.1991) ("[A]s a general rule exhibits which are testimonial in nature may not be

vided, of course, that the other § 3507 requirements are satisfied.)[44] The trial judge does, however, have discretion to depart from this default rule when in his judgment the situation so warrants (e.g., where the jury asks to rehear a § 3507 statement during its deliberations[45] or where the parties do not object to having the written or recorded statements go into the jury room as exhibits[46]). The trial judge's broad discretion in these circumstances is coextensive with his discretion to allow or to refuse to allow the jury to rehear in-court trial testimony of any witness.

We note that the § 3507 "default" rule applies narrowly only to written or recorded § 3507 statements of witnesses *other than* the criminal defendant. The default rule does *not* apply to written or recorded confessions or incriminating statements[47] a defendant makes directly (by his own hand or mouth) when those statements are admissible as trial exhibits without the use of § 3507 or even when the State uses § 3507 to admit a defen-

---

given to the jury during its deliberations....") We are not changing the long-standing rule that "exhibits admitted into evidence should *ordinarily* be provided to the jury for use during deliberations" with respect to non-testimonial exhibits or, indeed, any exhibits other than written or recorded § 3507 statements. *See ABA Principles for Juries and Jury Trials*, Principle 15B (2005) (emphasis added). The default rule applies very narrowly to written or recorded § 3507 statements.

**44.** *See* ABA Criminal Justice Standard 15–5.1(a). Materials to jury room. *Available at* http://www.abanet.or g/crimjust/standards /jurytrial_blk.html# 5.1. ("The court in its discretion may permit the jury, upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant; the court should permit the jury to take exhibits and writings that have been received in evidence, except depositions, and copies of instructions previously given.") A comment to this Standard in an approved draft of 1968, explains that this Standard:

follows the broader and prevailing view, although it expressly prohibits sending depositions into the jury room. Almost all jurisdictions have adopted the view that the jury should not be permitted to take with it to the jury room depositions which have been read in evidence. [citations omitted]. The rationale behind this position is that to permit depositions to be taken to the jury room would result in the jury rereading them and examining them and thus either giving them greater emphasis or subjecting them to closer criticism than the testimony of the witnesses who appeared in court.

We think that the rationale for adopting our default rule with respect to written and recorded § 3507 statements is the same that underlies barring depositions from the jury room (although we do not go as far as the Standard suggests—never allowing the jury to take written or recorded § 3507 statements into the jury room during deliberations).

**45.** *See Ward v. State*, 1991 WL 181476, **2–3, 1991 Del. LEXIS 311, *7 (Del.1991) (Order) (The trial judge did not abuse his discretion by allowing the court reporter to read back a portion of a witness' testimony pursuant to the jury's request.); *Zimmerman v. State*, 628 A.2d 62, 64 n. 1 (Del.1993) (At the jury's request during its deliberations a tape was replayed in the court room.)

**46.** *See e.g., Burke v. State*, 1997 WL 139813, 1997 Del. LEXIS 95 (Del.1997) (order) ("[Defendant] was not unfairly surprised by the contents of [witness's] three videotaped statements because he had stipulated to their admission as a joint exhibit prior to the trial.")

**47.** By "incriminating statements" we simply mean statements by the defendant not generally understood to be "confessions" (e.g., a defendant's recorded statements to an undercover police officer or informant made during the course of an investigation.) Moreover, to the extent this type of incriminating statement (the recording of a defendant's statements to an undercover police officer) is admissible by means other than § 3507, it is not "testimonial" in the way § 3507 statements are. Thus, the general rule we noted above that "exhibits admitted into evidence should *ordinarily* be provided to the jury for use during deliberations" would apply.

dant's statement. Generally, the State will not need to use § 3507 to introduce the defendant's confession or incriminating statement against him because D.R.E. 801(d)(2) applies to admissions by party opponents. A defendant's confession or incriminating statement is clearly an admission by a party opponent. As such, D.R.E. 801(d)(2) provides that it is not-hearsay.[48] Thus, there is no hearsay bar and a defendant's written or recorded confession will be admissible as a trial exhibit, provided all of the other Constitutional and procedural requirements for admitting the confession are satisfied. While as a general rule "exhibits which are testimonial in nature may not be given to the jury during its deliberations, an exception is made for written or recorded confessions in criminal cases."[49] This exception is "apparently based on the theory that the centrality of such confessions to the case warrants giving the jury access to them during deliberations."[50] Thus, although the same general concern that we have about giving the jury access to written or recorded § 3507 statements during their deliberations— that the jury might give undue emphasis and credence to those statements over all of the other trial testimony—arguably applies to confessions or other incriminating statements of a defendant, we think that written or recorded confessions or incriminating statements of a defendant properly admitted (whether through § 3507 or otherwise) should generally go into the jury room during deliberations because of the

48. D.R.E. 801(d)(2) provides that, a statement is not hearsay if:

The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity, or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy; provided that the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court.

49. Jennings, 815 S.W.2d at 440.

50. See Jennings, 815 S.W.2d at 440. In Jennings, the defendant argued that the trial judge erred by granting a jury's request to rehear a videotaped statement of a third party witness, in which the third party witness told police that the defendant admitted to participating in the crime for which he was on trial. In the video-taped statement the third party witness related to police statements the defendant made to him regarding details of the crimes. The third party witness also told the police that the defendant admitted to him, "I think I killed them...[and that defendant] assumed he shot the lady." The Court noted that those admissions "were admissions in the nature of a confession to the crimes charged" and that they "directly implicated appellant in the crimes." We do not read "confession or incriminating statements" as broadly as the Jennings Court. "Confession or incriminating statements," in this context, should be limited to written or recorded statements the defendant actually makes directly. See Jonathan M. Purver, Annotation, Permitting Documents or Tape Recordings Containing Confessions of Guilt or Incriminating Admissions to be Taken into Jury Room in Criminal Case, 37 A.L.R.3d 238 (1971)(updated Sept. 2005). To the extent that our § 3507 "default rule" applies to a defendant's allegedly incriminating admission that is filtered through a third party witness, (as in Jennings and in the case at bar where Ahkee's various § 3507 statements quoted several of Flonnory's incriminating admissions) the State can move the trial judge to allow the third party witness's § 3507 statement containing the defendant's incriminating admission to go into the jury room during the jury deliberations, just as it could with any § 3507 statement of a witness. At that point, the trial judge has broad discretion to grant or deny the State's application to allow the statement to go to the jury during deliberations.

centrality of the confessions or incriminating admissions to the State's case.[51]

 This is not to say that the defendant can never keep his confession or incriminating statement from going into the jury room during jury deliberations (because of the undue emphasis concern) by making a timely objection. But, to prevent that result, the defendant has the very heavy burden of showing that the probative value of allowing the his confession into the jury room is substantially outweighed by the danger of unfair prejudice.[52] We note that it will almost always be within a trial judge's discretion to allow the defendant's written or recorded confession or incriminating statement to be admitted as a trial exhibit that goes into the jury room during jury deliberations.

The State contends that this § 3507 "default rule" runs against decades of practice and jurisprudence, citing *Atkins v. State*[53], *Feddiman v. State*[54], and *Norcross v. State*[55] for the proposition that the admission of recorded § 3507 statements as exhibits that go into the jury room during jury deliberations is well-established. Putting to one side the fact that decades of practice is not a legally cognizable reason to support the automatic admission into evidence as separate trial exhibits of written or recorded § 3507 statements that the jury has previously heard during the trial, these cases do not advance the State's position because they addressed the use of transcripts in conjunction with recordings

admitted without objection. The cited cases did not discuss the use of recorded or written § 3507 statements as separate trial exhibits that went into the jury room during the jury's deliberations because the defendants in those cases did not raise this objection. Our ruling today does not disturb the rulings or reasoning of any of those cases.

 *State v. Cousins*[56], a case involving a defendant's post-conviction relief proceeding, is also relevant to this case. There, the trial judge found that "all of the [defendant's] claims involving the introduction of [a] videotape [were] procedurally barred." One of the defendant's ineffective assistance claims was that his attorney should have objected to allowing a videotape of a witness interview to go into the jury room during the jury's deliberations. In evaluating this claim, the trial judge noted,

**The jury is allowed to have exhibits and if audio tape or video tape is in evidence, the jury gets any equipment to play it. The video tape was introduced into evidence** ... Nevertheless, assuming an objection could have prevented the video tape from being considered during jury deliberations, the Defendant has established no prejudice whatsoever other than his conclusory claim that he was denied a fair trial. The claim fails.[57]

In an order affirming that ruling, after agreeing that the defendant's claims with

---

**51.** *See* Jonathan M. Purver, Annotation, *Permitting Documents or Tape Recordings Containing Confessions of Guilt or Incriminating Admissions to be Taken into Jury Room in Criminal Case*, 37 A.L.R.3d 238 (1971)(updated Sept. 2005).

**52.** D.R.E. 403.

**53.** 523 A.2d 539 (Del.1987).

**54.** 558 A.2d 278 (Del.1989).

**55.** 816 A.2d 757 (Del.2003).

**56.** 2003 WL 22810504, 2003 Del.Super. LEXIS 391 (Del.Super.Ct.2003) *aff'd by* 2004 WL 1097700, 2004 Del. LEXIS 215 (Del.2004) (order).

**57.** 2003 WL 22810504, **5–6, 2003 Del. Super LEXIS 391, *14. (emphasis added).

respect to the admission of the video-tape were procedural barred, we noted that: "It was not error for the Superior Court to provide the videotape of the interview to the jury during its deliberations. Physical evidence admitted against a defendant at trial is appropriately submitted to the jury during its deliberations at the judge's discretion."[58] Nothing in our Order in *Cousins* is inconsistent with the legal rule and result that we reach today. In our Order affirming the Superior Court judge's decision, we simply noted that the trial judge did not err by submitting the videotape to the jury during its deliberations. This is in accord with the rule we adopt today. If there is a request from an offering party to supply audio or video playback equipment to the jury and to allow the § 3507 statements into the jury room as exhibits, the judge is empowered, as a discretionary matter, to grant the application. By whatever form an application may be made to allow a § 3507 statement into the jury room (whether on the motion of a party or at the request of a jury), the trial judge must weigh the relative prejudice to the parties against the danger of unfairly emphasizing one piece of testimonial evidence over that of all other testimonial evidence.[59]

In the case at bar, the trial judge relied on the best evidence rule as a rationale for admitting the § 3507 statements as separate trial exhibits. We acknowledge that the best evidence rule may be applicable to § 3507 statements. Thus, where a recording of a conversation and a transcript of that conversation both exist, the proponent of the out-of-court statement must introduce the recording and not the transcript to satisfy the best evidence rule.[60] But, that rule is not a proper rationale for admitting the recording as a trial exhibit that goes into the jury room during the jury's deliberation after the proponent has played the recording or had the writing read to the jury during the trial itself. By relying on the best evidence rationale alone, the trial judge failed to exercise properly his DRE 403 discretion to decide whether to admit the § 3507 statements as separate trial exhibits that would be available to the jury during deliberations. A proper analysis required the trial judge to determine whether the benefits of admit-

---

58. *Cousins v. State*, 2004 WL 1097700, *1, 2004 Del. LEXIS 215, *4 (Del.2004) (Order). In this case the videotape was admitted pursuant to § 3507. Although in our affirming Order, we intimated that the videotape evidence was "physical evidence," it is physical evidence only to the extent it is an item in the jury's exhibit package. But when it is replayed, at that point it becomes "testimonial." Indeed, § 3507 evidence is more appropriately termed "testimonial" evidence because it represents statements made by a declarant.

59. *See also, Saunders v. State*, 401 A.2d 629 (Del.1979). In *Saunders*, the defendant argued that the trial judge committed error by admitting into evidence five statements of his accomplices under § 3507 on the grounds that they were, *inter alia*, cumulative and prejudicial. We held that in those circumstances, the trial court did not err in admitting the statements and noted that "the state-

ments were properly submitted as evidence to the jury during deliberations." *Id.* at 631. *Saunders* does not explain why the statements were properly submitted as evidence to the jury during their deliberations, and in any event is not controlling in this case, since the exercise of judicial discretion is highly fact sensitive. This exercise is no more than a typical DRE 403 analysis.

60. *See Atkins*, 523 A.2d at 543. In *Atkins*, the State introduced transcripts of a conversation when actual tapes of the conversations, of which transcripts were introduced, were available at trial. The transcriptions were offered as proof of the contents of the tape recording, i.e., the conversation. Citing D.R.E. 1002, we held that under those circumstances, "the State was obligated to introduce the original tape recording to prove its contents (the conversation)."

ting the § 3507 statements were outweighed by the danger of unfairly emphasizing the testimony of one witness over the testimony of others. Notwithstanding that, after a careful review of the record and given the weight of the evidence, we are satisfied that any error in the admission of the recorded or written § 3507 statements as exhibits that went into the jury room during deliberations in addition to being properly played or read at trial was harmless beyond a reasonable doubt. Accordingly, Flonnory's third argument on appeal must fail.[61]

### 4. Brady Violation—State's Failure to Provide Flonnory with Revised Transcription of Witness's Statement

■ During the course of pre-trial discovery before Flonnory's first trial, the State provided the defendant a copy of a videotaped statement that Lionel "Moose" Robinson, the "gypsy" taxi driver who took Flonnory and Twyman to the scene of the shooting, gave to the police. The State also produced a transcript of Robinson's statement. The State's submitted version of the transcript, however, omitted Robinson's observation that both Flonnory and Twyman were in possession of semi-automatic weapons and that neither had a revolver.[62] Thus, at Flonnory's first trial, Robinson was not questioned about the weapons alleged to be involved. The State's theory of the case was that Flonnory shot and killed Farmer with a revolver. At his first trial Flonnory testified that he was not armed and did not fire. Moreover, the defense contended, return gunfire was involved and that Flonnory never had a revolver.

Several months later, before Twyman's trial, the State provided Twyman's counsel with a corrected version of Robinson's transcript.[63] During Twyman's trial, Robinson testified that he saw neither Twy-

---

**61.** It is interesting to note that, despite the trial objection and Flonnory's argument on appeal, during closing arguments, his defense counsel requested that the jury listen to the tape of Dwayne Warren's testimony during their deliberations: "Flash forward approximately two weeks later, just before Mr. Flonnory arrives with Mr. Korey Twyman, Dwayne Warren—*and this will be in the audio tape, I ask you to review it*—says just as they arrived he observed Duke slap boxing. *Please listen to that tape.*" At another portion of the defense's closing argument, defense counsel urged the jury to view one of the other videotapes: "if you are to remember any other numbers, these are the numbers I want you to remember. I want you to remember 15:27:30, 3:27 in the afternoon, 30 seconds, through 3:28:15. That's Mr. Freddy Flonnory's—that's a portion of Mr. Flonnory's videotaped statement...*Play the tape and you listen to it.*" At the end of his closing argument, defense counsel again asks the jury if it "could take some extra time and review Mr. Flonnory's tape in full, but begin with the part where he talks about seeing gun sparks flying, because I think that is very important...." Despite these comments, Flonnory still argues

in his brief that it was error for the trial judge to allow this and other exhibits into the jury room. Although the defense made a formal objection to allowing the "memorializations" of § 3507 statements, the fact that defense counsel made reference to at least certain of the tapes, particularly that of Freddy Flonnory's statement, undercuts the defense's argument on appeal. Clearly the defense wanted the jury to give "emphasis and credence to that portion of the testimony."

**62.** The relevant portion of this version of the transcript was:

Detective: Did you see any XXX? Any guns?
Robinson: Yeah. Mumbling. (They might've left their fucking jackets up there, picked them up from Frank's car.)

**63.** The relevant portion of the second version of the transcript was:

Detective: Did you see any heat on them? Any guns?
Robinson: Yeah. Mumbling. 2[Two]—9 millimeters, that's what they wrapped their fucking jackets in, that's what they threw in Frank's car.

man nor Flonnory with a revolver on the night in question.

Before Flonnory's retrial, Flonnory moved to "Preclude a Death Sentence And Use of Defendant's Prior Testimony" as evidence in the new trial. The ground for the motion was that the State did not timely disclose the exculpatory evidence from Robinson's transcript that on the night of the murder Robinson observed Flonnory with a .9 millimeter semi-automatic weapon. The trial judge denied this motion, noting that, "[i]t is undisputed that the Defense had access to ... Robinson's video taped statement prior to the introduction of the statement at Flonnory's trial...The jury, the defense, and the judge had access to the exculpatory evidence during the Flonnory trial."

Flonnory appeals from the Order denying the motion. Flonnory contends that by failing to provide him with an accurate transcription of Robinson's statement, the State violated its obligations under *Brady v. Maryland* [64] to disclose all material exculpatory evidence to the defendant. Although Flonnory had access to this information before his second trial, Flonnory argues that if he had the information before the first trial that he would not have taken the stand to testify because "meaningful disclosure that Robinson told the police that he saw Flonnory with a semi-automatic, not a revolver, would have rendered Flonnory's testimony unnecessary" to support his return gunfire defense.

We find Flonnory's argument unpersuasive. The State produced a copy of the videotaped statement to defense counsel before the first trial. Flonnory does not claim otherwise. The defendant had an obligation to review the first transcript and the video taped recording of Robinson's statement to ensure that the transcript accurately reproduced the statement. "[T]he [State] will not be found to have suppressed material information if that information also was available to a defendant through the exercise of reasonable diligence." [65] The State did not violate its *Brady* obligations by producing an inaccurate transcription of Robinson's statement before the first trial, because it also produced an accurate video taped copy of Robinson's statement. Had the defense reviewed the video tape in conjunction with the transcript, it could have uncovered the transcription error. Accordingly, Flonnory's argument must fail.

### 5. Admission of Dwayne Warren's Former Testimony

During Flonnory's first trial, the prosecution called Dwayne Warren. Warren testified and the defense then had the opportunity to cross-examine him. At the first trial, Warren claimed that he did not carry a weapon and that, while he was initially going to retaliate for the shooting, he had given up the idea of retaliation.[66] Two days after his testimony, Warren was arrested and later convicted of robbery and assault.[67] Warren attempted to plead

---

**64.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

**65.** *United States v. Morris,* 80 F.3d 1151, 1170 (7th Cir.1996) (citations omitted).

**66.** In argument before the trial judge, the defense characterized these portions of Warren's testimony at Flonnory's first trial in the following way: "the former testimony in-

cludes essentially a suggestion by Mr. Warren that after the July 1st incident, he was no longer involved with guns, and was of a peaceful nature, and had abandoned any violence."

**67.** In his brief, Flonnory states that Warren was arrested and convicted for "shooting a person." In the transcript of the trial, the defense counsel made this same statement to

"guilty but mentally ill" in connection with the robbery/assault proceedings. During a court-ordered evaluation relating to the plea, Warren reported to the doctor conducting the evaluation that the events underlying the robbery/assault were triggered by a psychological trauma such that every time he saw a white van he "went off" because the vehicle driven by the perpetrators of the crime for which Flonnory was charged was a white van.

Before Flonnory's second trial, the State moved "for an Order *in Limine* admitting the former testimony ... of various potentially unavailable witnesses" under D.R.E. 804. With certain conditions (i.e., the State was required to demonstrate the unavailability of the witness at trial), the trial judge granted the State's motion.

During Flonnory's second trial, the State called Warren to the stand. Out of the presence of the jury, Warren invoked his Fifth Amendment privilege against self-incrimination based on his own set of pending First Degree Murder charges. Consequently, he was unavailable to testify in Flonnory's retrial. After Warren invoked his privilege against self-incrimination, the State had Warren's former testimony read into the record.

On appeal, Flonnory claims that it was error for the trial judge to allow the State to introduce Warren's former testimony because doing so violated Flonnory's constitutional rights to confront and to cross-examine Warren. Specifically, Flonnory argues that he had no meaningful opportunity to cross-examine or to confront Warren's claim of non-violence in his former

testimony, with Warren's later convictions for robbery and assault. Flonnory also argues that he had no opportunity to cross-examine the doctor who conducted Warren's psychological evaluation about Warren's "white van" statement which, Flonnory claims, supports Flonnory's return gunfire defense. Because Warren reported this allegedly "critical and potentially case-dispositive" fact after Warren's former testimony, Flonnory contends that defense counsel should have been entitled to cross-examine Warren on this fact. We review alleged constitutional violations relating to a trial court's evidentiary ruling *de novo*.[68]

Under D.R.E. 804(b) a declarant's former testimony is not excluded as hearsay if the declarant is unavailable as a witness in a later proceeding and the party against whom the testimony is offer had an opportunity and similar motive to develop the declarant's former testimony by direct, cross or redirect examination. *Crawford* holds essentially the same: testimonial evidence offered against a defendant by a witness not present at trial can be admitted only where the witness is unavailable and only where the defendant has had a prior opportunity to cross-examine the witness.[69] In *Johnson v. State* we discussed *Crawford's* cross-examination requirement as follows:

> Crawford did "not expressly require any specific quality of cross-examination...." The Confrontation Clause only guarantees a defendant the opportunity for effective cross-examination of the de-

---

the trial judge. The Deputy Attorney General quickly corrected defense counsel and informed the Court that Warren did not "shoot anybody." Defense counsel then apologized and noted that Warren "hit someone and had a gun" and conceded that Warren did not "shoot a person." Although the State disputed the statement that Warren "shot a person"

before the trial judge, it did not do so in its brief on this appeal. Nonetheless, under either characterization of the facts, Flonnory's argument on appeal fails as a legal matter.

68. *Johnson* 878 A.2d at 427.

69. 541 U.S. at 58, 124 S.Ct. 1354.

clarant, not effective cross-examination in whatever way and in whatever manner a defendant may wish. Thus, when a witness takes the stand at trial, and is subject to cross-examination, the traditional protections afforded under the Confrontation Clause are satisfied.[70]

In the present case, Flonnory had a similar motive and opportunity to cross-examine Warren during Flonnory's first trial. At the retrial, Flonnory may not have had the opportunity for "effective cross-examination in whatever way an in whatever manner he may have wished", but the cross-examination at the first trial [71] was sufficient to satisfy *Crawford* and D.R.E. 804(b).[72]

■■■ Assuming *arguendo* that it was error to admit Warren's former testimony at Flonnory's second trial, the error would have been harmless. At the retrial, after Warren's testimony was read into the record, the trial judge read the jury a stipulation the parties had reached regarding Warren's conviction. The trial judge informed the jury that "Warren pled guilty to Robbery First Degree and a charge of Assault second degree, both felonies, as a result of an incident which occurred on October 16, 1998. The gun used in that offense was a nine-millimeter semi-automatic, [with] which Dwayne Warren struck the victim." Moreover, the defense also introduced into evidence the doctor's notes from Warren's psychiatric evaluation, which included the following statement: "[Warren] reported experiencing panic and paranoia when seeing white vans reminiscent of ones used by the perpetrators." Even though Flonnory did not have the opportunity to cross-examine Warren about the events that occurred after Warren's former testimony or his statement during the psychiatric evaluation in connection with his guilty plea, Flonnory still had the opportunity to put that evidence before the jury and to comment on it in his closing argument. Accordingly, Flonnory's fifth argument on appeal must fail.

### 6. Trial Court's Alleged Error in Failing to Inform the Jury That Dwayne Warren Was Unavailable to Testify in Person at Flonnory's Second Trial Because He Invoked His Fifth Amendment Privilege.

■■■ As earlier noted, in Flonnory's second trial, Dwayne Warren invoked his Fifth Amendment privilege outside of the presence of the jury. The prosecution then had Warren's testimony from Flonnory's first trial read into the record. The defense argued to the trial judge that it was critical that the jury be told why Warren was unavailable and that his unavailability was "not through death, through

---

70. 878 A.2d at 428–429.

71. *People v. Wilson*, 36 Cal.4th 309, 343, 30 Cal.Rptr.3d 513, 114 P.3d 758 (2005) (citing *Crawford v. Washington*, 541 U.S. 36, 55–56, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)) ("In *Crawford v. Washington*, the high court stated that a prior opportunity to cross-examine a witness was 'dispositive' of the admissibility of his testimonial statements, 'and not merely one of several ways to establish reliability.' Because defendant had an opportunity to cross-examine [the witness] at the first trial, this satisfied the *confrontation clause*.")

72. See *Id.* at 343, 30 Cal.Rptr.3d 513, 114 P.3d 758 ("Both the United States Supreme Court and this court have concluded that when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement, regardless whether subsequent circumstances bring into question accuracy or the completeness of the earlier testimony.") (quotations omitted) (citing *People v. Samayoa*, 15 Cal.4th 795, 64 Cal. Rptr.2d 400, 938 P.2d 2 (1997) (citing *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970))).

any misconduct, or any threat by Mr. Flonnory, or anyone associated with him." Flonnory thus asked the court "to take judicial notice or to instruct the jury on the reasons for [Warren's] unavailability." The State responded that the Court should not instruct the jury that Warren was unavailable by reason of having invoked his Fifth Amendment privilege, because that would encourage the jury to speculate about why he did so.

In an oral ruling, the trial judge agreed with the State's speculation argument. The trial judge concluded that "simply say[ing] that the witness is unavailable ... explains it, as far as the jury needs to know. I'm going to deny the motion to give instructions with respect to the Fifth Amendment." In accordance with his ruling on this motion, before permitting the State to have Warren's testimony read into the record, the trial judge informed the jury: "you're going to hear testimony read from Mr. Warren who is unavailable to testify at this trial." During the State's rebuttal closing argument, after a defense objection, the trial judge again instructed the jury about Dwayne Warren's unavaila-

bility at the trial, this time explaining why he was unavailable:

> Ladies and Gentleman, you are instructed that Dwayne Warren was unavailable to testify at this trial because he is currently facing charges that don't arise from this particular incident.

■ On appeal Flonnory argues that introducing Warren's former testimony without either requiring Warren to invoke his Fifth Amendment rights in front of a jury or, at a minimum, informing the jury of the reason for his unavailability violated Flonnory's constitutional rights to cross-examination and confrontation. We review issues involving the constitutional rights of a defendant *de novo*.[73]

■ Permitting a witness to invoke the Fifth Amendment outside the presence of a jury does not violate the Constitutional rights of a criminal defendant.[74] Accordingly, the only issue we need to address is whether the trial judge, must, "at a minimum", inform the jury that a witness is unavailable for any appropriate reason other than because the witness invoked his Fifth Amendment privilege. We hold that the answer is yes.[75] As the D.C.

---

**73.** *Grace v. State*, 658 A.2d 1011, 1015 (Del. 1995).

**74.** *See e.g., Banther v. State*, 823 A.2d 467, 489 (Del.2003) ("The trial judge correctly noted that Banther had no right to have Schmitz assert his Fifth Amendment privilege before the jury."); *See also United States v. Martin*, 526 F.2d 485, 487 (10th Cir.1975) ("[I]t was well within the discretion of the trial court to refuse to allow the informant to be called to the witness stand and be compelled to thereafter invoke his Fifth Amendment right in the presence of the jury"); *United States v. Monnier*, 412 F.3d 859, 862–863 (8th Cir.2005) (citation omitted) ("We have held that 'a defendant does not have the right to call a witness to the stand simply to force invocation of the right against self-incrimination in the presence of the jury.' "); *United States v. Hand*, 1995 WL 743841, 1995 U.S.App. LEXIS 35321 (10th Cir.1995)("[A] defendant has

no right to force a witness to invoke the privilege in front of a jury."); *But See Mosley v. State*, 652 So.2d 767, 768 (Ala.Crim.App. 1994) ("A witness has the right to invoke the Fifth Amendment and refuse to testify; however, that witness must take the stand in the presence of the jury and be asked questions that would elicit incriminating evidence if answered before the witness can invoke his Fifth Amendment privilege. Hence, the trial court erred in failing to require the witness to take the stand.")

**75.** We do not hold that the trial judge must explicitly inform the jury that a witness invoked his Fifth Amendment privilege outside of the presence of the jury and instruct them to draw no inference therefrom. Indeed, this may do more harm than good. *Bowles v. United States*, 439 F.2d 536, 541–542 (D.C.Cir.1970) ("The jury may think it high

Circuit noted in *Bowles v. US:* "It is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." [76]

In *Bowles,* the trial judge refused to allow the defendant to call a witness after he ascertained, out of the presence of the jury, that the witness intended to invoke the Fifth Amendment. On appeal, the Court noted that the trial judge "properly admonished counsel to make no mention in their closing argument of the lack of testimony from a witness counsel knew would have invoked the Fifth Amendment," [77] but that the "trial judge could properly have given a neutralizing instruction, one calculated to reduce the danger that the jury will in fact draw an inference from the absence of such a witness." [78] Moreover, "[h]ad either counsel requested the court to instruct the jury that they should draw no inference from [the witness's] absence because he was not available to either side, it would have been error to refuse this instruction."

Most cases that address the propriety of a "neutralizing instruction" involve facts like those in *Bowles* where the defendant sought to call a witness who, out of the presence of the jury, invoked the Fifth Amendment. [79] Although in this case, it was the prosecution that sought to call Warren, we, nevertheless, believe that the concern that the jury might draw an adverse inference from the absence of a witness is also present where the defendant did not want to call the witness in the first instance, but the prosecution seeks to introduce the former testimony of that witness. Although ideally the trial judge should have given the neutralizing instruction before Warren's earlier testimony was read into the record and should have admonished the jury that it could not draw any inferences from Warren's absence at trial, the trial judge's instruction to the jury about Warren's testimony during the course of the State's rebuttal closing argument was sufficient to satisfy our concerns in this case. [80] The trial judge's instruction sufficiently informed the jury of the reason for Warren's unavailability and prevented the jury from speculating about why Warren was absent from Flonnory's retrial. Accordingly, the trial judge did not err, as Flonnory suggests, by failing to, "at a minimum, inform the jury of the reason for Warren's unavailability."

courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination.")

**76.** *Bowles,* 439 F.2d at 541 (D.C.Cir.1970). *See also* C.T. Drechsler, Annotation, *Inferences Arising from Refusal of Witness Other than Accused to Answer Question on the Ground that Answer Would Tend to Incriminate Him,* 24 A.L.R.2d 895 ("[T]he general rule is that when a witness, other than the accused, declines to answer a question on the ground that his answer would tend to incriminate him, that refusal alone cannot be made the basis of any inference by the jury, either

favorable to the prosecution or favorable to the defendant.... The reason for the above rule is that, in declining to answer a question on the ground that the answer would tend to incriminate him, the witness is exercising a constitutional right personal to himself, the exercise of which should neither help nor harm a third person.")

**77.** *Id.* at 542.

**78.** *Id.*

**79.** *See State v. Haddad,* 767 So.2d 682 (La. 2000) (collecting cases).

**80.** *See e.g., United States v. Martin,* 526 F.2d 485, 487 (10th Cir.1975) (citing a more detailed neutralizing instruction.)

**7. *Trial Judge's Denial of Flonnory's Motion for A Judgment of Acquittal on the First Degree Murder Charges***

▇▇▇▇ After the State rested its case, Flonnory moved for a judgment of acquittal on the First Degree Murder Charges. The trial judge denied the motion. Flonnory now appeals this ruling. We review *de novo* a trial judge's denial of a motion for a judgment of acquittal to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of a crime.[81] On appeal Flonnory also argues that there was insufficient evidence to support the Attempted Murder charge, although Flonnory concedes that his motion for a judgment of acquittal before the trial judge did not address the Attempted Murder charges. Therefore our standard of review with respect to the Attempted Murder convictions is plain error.[82] Even under a *de novo* standard, we find that there is sufficient evidence for a rational finder of fact, viewing the evidence in the light most favorable to the State, to find Flonnory guilty beyond a reasonable doubt.

A person is guilty of First Degree Murder when that person intentionally causes the death of another person.[83] To be guilty of attempted murder, a person must intentionally engage in conduct that would constitute murder if the circumstances were as he believed them to be.[84] A person acts intentionally when, "it is the person's conscious object to engage in conduct of that nature or to cause that result."[85] Flonnory argues that no rational finder of

fact could conclude beyond a reasonable doubt that Flonnory intended death as a result of either Twyman's and/or his actions. We disagree.

The State presented evidence including: on July 1, 1997 Adams shot Korey Twyman, shot at Flonnory with one bullet passing through Flonnory's clothing; and another bullet hitting Flonnory's mother's car when his nieces and nephews were inside. This evidence established Flonnory's a motive to exact revenge. On the night when Twyman decided to retaliate, Flonnory joined him, stating "let's go do them, handle our business." The jury could reasonably interpret "do[ing] them" as "shooting them." Flonnory took a balled up black hooded sweatshirt with him when he got into Robinson's car. The location of the shell casings in the mouth of the alleyway suggested an ambush of the intended targets. Adams, Warren and Farmer all suffered multiple gunshot wounds. After the shootings, when Flonnory got back into Robinson's car, he was wearing the hooded sweatshirt that he had balled up when he first got into the car. Flonnory then tried to put the "hoodie" over the stock of the gun. Flonnory and Twyman bragged to their friends about how they had used up all of their ammunition to "shoot up the block." Given the context, the jury could rationally have concluded that Flonnory had the requisite intent to support convicting him of First Degree and Attempted Murder. The trial judge did not err by refusing to grant Flonnory's judgment of acquittal with respect to the First Degree Murder charge,

**81.** *Priest v. State*, 879 A.2d 575, 577 (Del. 2005).

**82.** *Hainey v. State*, 878 A.2d 430, 432 (Del. 2005).

**83.** 11 Del. C. § 636(a)(1).

**84.** 11 Del. C. § 531(1).

**85.** 11 Del. C. § 231(a)(1), *See Burrell v. State*, 766 A.2d 19, 25 (Del.2000).

and there is no plain error with respect to the Attempted Murder charge.

### 8. Prosecutorial Misconduct—Alleged Improper Remarks During Closing Arguments

 Flonnory argues that the Deputy Attorney Generals made improper remarks during summation and rebuttal because they vouched for witness's credibility, commented on the defendant's exercise of his right to remain silent, and attacked the defendant's character. We review a claim of prosecutorial misconduct de novo to determine whether the conduct was improper or prejudicial.[86] To the extent we find that prosecutorial misconduct exists, we then consider (1) the closeness of the case; (2) the centrality of the issue affected by the alleged error; (3) the steps taken to mitigate the effects of the alleged error[87]; and (4) whether the prosecutor's statements were repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.[88]

 Flonnory cites three instances of alleged prosecutorial misconduct in the State's summation and rebuttal arguments. He first argues that the prosecutors improperly injected their personal beliefs concerning the credibility of witnesses and Flonnory's character by stating:

> Some witnesses had difficulty recalling every detail of their earlier interviews. Some witnesses didn't want to recall them at all when faced eyeball to eyeball with the defendant. Remember what Parsons said? It is not cool to be a snitch. Is it not likely that they are the witnesses who want to remain silent

when they are face-to-face with the defendant[?]

After hearing this comment, the defense immediately requested to approach the bench. Defense counsel argued to the trial judge that this statement represented a personal opinion of the prosecutor that "people would be afraid of Freddy Flonnory." He then asked for a mistrial. The prosecutor responded that this statement was "merely an explanation why in private [people] will say one thing but in the presence of other individuals they may not give the same explanation because, as Renee Parsons says, it is uncool to be a snitch." The trial judge concluded, "I'm going to let the prosecutor go on with the summation. I think that depending on how that goes, obviously, there could be no inference whatsoever that there is a fear of the defendant because there is no evidence in the record.... If it is clear as to what you are saying then I think that solves the problem if there is any created." Defense counsel then requested that the trial judge give the jury a curative instruction that there was no evidence that the witnesses were afraid of Flonnory. The trial judge declined to do so, noting "that would raise the whole issue of violence, that would be more prejudicial." After the sidebar the prosecutor continued:

> It is true, ladies and gentlemen, that memories can fade and people recall different things differently at different points in their lives. Human nature being what it is, people will give statements behind closed doors or with a police officer when they are trying to benefit themselves. But in the clear

---

**86.** *Price v. State,* 858 A.2d 930, 939 (Del.2004) (citing *Hunter v. State,* 815 A.2d 730 (Del. 2002)).

**87.** *Hughes v. State,* 437 A.2d 559, 569 (Del. 1981).

**88.** *Hunter v. State,* 815 A.2d 730, 738 (Del. 2002)

light of day when it is going to be known publicly they provided information, they don't want to accept responsibility for their prior statements. Certainly, many of these people were friends and family of the defendant. Is it any wonder they wouldn't want it to be known they, in fact, had provided such information or be looked at as a snitch? Because as Renee Parsons says, it is not cool to be a snitch.

The prosecutor then continued with summation without further objection from the defense.

■ It is well-settled that prosecutors may not express their personal opinions or beliefs about the credibility of witnesses or about the truth of any testimony.[89] In this case, however, as a factual matter, we do not think that the statements are personal opinions that amount to improper prosecutorial comment. The defense seizes upon one sentence in the first paragraph, "some witnesses didn't want to recall [every detail of their earlier interviews] at all when faced 'eyeball to eyeball' with the defendant," and uses that sentence to suggest that the prosecution expressed personal beliefs about Flonnory's character and several witnesses' credibility by implying that the witnesses were afraid of Flonnory. We disagree with this interpretation. The statements, read in context, were not improper expression of personal beliefs about the credibility of the witnesses, but rather were possible explanations for why several witnesses in the case took the stand and failed to remember their earlier statements. Moreover, in context, the prosecutor was not arguing that the witnesses were afraid of Flonnory. Accordingly, there was no misconduct and no need to now engage in the *Hunter–Hughes* inquiry.

■ Flonnory also contends that the prosecution made a "recklessly inaccurate statement which seriously denigrated" his defense. The statement in which the prosecution alleged misrepresented evidence was:

Ladies and gentleman, the defense put up a list of, quote, suspects in this return gunfire theory. They are asking you to speculate, to guess. They are hoping you might buy that—the list really doesn't make a whole lot of sense—this white van sticks out. Out of all the reams of paper that are involved in this case, probably thousands, maybe even hundreds of thousands of pieces of paper in this case, they take out one line.

At this point, defense counsel objected that the prosecutor was commenting about matters not in evidence. The prosecution agreed to rephrase his statement; he continued:

Ladies and Gentleman, out of all the paper that is involved in this case, no matter how much it is, it certainly is a lot, the defense takes one line out of one report that says something about Dwayne Warren and white vans and throws it up against the wall to see whether it will stick or not.

What evidence did they—let me rephrase that, your Honor.

How much faith can you have in that one line taken out of one report? It was an evaluation of Dwayne Warren in August of '99, more than two years after the incident. And Dwayne Warren apparently, from the report, is suffering emotionally over what happened. He is very emotional, his cousin got killed, all right in front of him, panic, anxiety. This is the guy that, he testified in his former testimony, that he actually

---

**89.** *Clayton v. State,* 765 A.2d 940, 942 (Del. 2001).

tripped over his cousin's body as he was trying to get away from the shooting. The guy that was right there when he died. I'm hit. The last words he says is Smoke.

You didn't hear anything else about that. One line. Did Dwayne Warren say it. Don't know. Did Dr. Zewell get it right? Don't know. Did he record it accurately in his report? Don't know.

The defense counsel then asked to approach the bench. He argued to the trial judge that the prosecution had taken advantage of the fact that Warren was unavailable for testimony because of the pending charges. In order to mitigate the effect of this statement, the defense counsel requested an instruction telling the jury that Warren was not available because he was facing other charges. The trial judge gave the jury that instruction.[90]

▮ Again, in this area the law is well-settled: prosecutors may not misrepresent the evidence presented at trial.[91] Flonnory points to the prosecutor's statement that Warren's inconsistent statement was "one line" taken from "hundreds of thousands of pieces of paper" to argue that it was factually incorrect and referred to facts not in evidence. The defense notes that "there were not 'hundreds of thousands of pieces of paper' presented as evidence or otherwise. Most of the evidence was testimonial. The magnitude of this representation of evidence is unacceptable."

We disagree. Given the context, it is clear that the prosecutor was merely using hyperbole to make a point. After the defense's objection the prosecutor rephrased his statement: "out of all the paper that is involved in this case, no matter how much it is, it certainly is a lot, the defense takes

one line out of one report that says something about Dwayne Warren." Had the prosecutor made that (amended) statement to begin with, it would not have amounted to misconduct. The rephrased statement did not misstate the evidence yet made the same hyperbolic point as the initial statement. Given the broader context of the initial statement and its obvious hyperbolic nature, we cannot conclude that it amounts to prosecutorial misconduct.

▮ Flonnory's final prosecutorial misconduct argument is that the prosecution improperly commented on the exercise of his right to remain silent. In evaluating this argument, we quote extensively the prosecution's statements to the jury:

The aftermath of the murders where is Freddy Flonnory? What does the defendant do after the shooting? After this, as he claims, is totally [sic] unexpected turn of events he lets Korey dispose of the guns, guns, as he says gun. Everybody else maintains there are two guns, but according to the defendant there is only one.

At this point, ladies and gentleman, the defendants [sic] in action [sic] is as conspicuous as his earlier actions. He never once claims to have questioned Korey about the firing of a gun. If what he says is true and that's totally unexpected and he gets back to the car, why doesn't he comment, what the heck was that? What were you thinking? I thought we were going over there and rumble. Nothing. He never yells at Korey, you are nuts, this is going to come back on us now.

He also never tells anyone about return fire they allegedly experienced at Sixth and Jefferson. It magically appears a year-and-a-half later in his testimony in

---

90. *See Supra.*

91. *Hunter,* 815 A.2d at 735.

a prior proceeding. He gives the return fire story after he has the benefit of the ATF report, the report which has definitely concluded at that point that two guns were used. *No such return fire* explanation when he original talks to the police, because at that point there was no known evidence about two weapons. It wasn't until the November ATF report when it was exclusively known the ballistics of two separate guns being used.

Why doesn't he say something to Moose? Oh, my gosh, Moose, they started shooting back at us. There is no conversation about that either. They never go on back to the corner and say those you know what's fired back at us again. Not to anyone on the corner, not to Korey, not to Moose. We don't hear about it until a year-and-a-half later when he is testifying in another proceeding.

After hearing the last statement, the defense counsel interrupted and asked to approach the bench. In an ensuing sidebar, counsel argued to the trial judge that the prosecutor's comment to the jury was essentially a comment on Flonnory's right to remain silent. The defense counsel then moved for a mistrial, which the trial judge denied (the defendant did not appeal that decision). After denying the mistrial, the trial judge instructed the prosecutor to clear up the issue. She did that by stating:

As you will be instructed, your recollection controls with respect to the evidence.

The State simply submits to you that in his original statement there was no mention truly of a return gunfire, however, that was inconsistent with what he said some 15 months later when he provided testimony in a proceeding.

Several minutes later, the prosecutor made one more remark mentioning the 15 months: "Eventually the defendant recalls 15 months after that there was some type of return fire." The defense counsel approached the bench. Where the following sidebar conversation ensued:

Defense Counsel: We are returning, once again, to the suggestion that it is convenient that for the first time that he recalls there might be second gunfire 15 months later.

THE COURT: You are going to point out that you believe he said at the time of the interview something like there was return gunfire?

DC: Furthermore, he was represented by counsel by July 30th of that year and operating through counsel. To this idea, 15 months going by before saying anything, first of all, is telling the jury, well, this is the first trial, but 15 months before—years before the first trial, then comes up with this. When did he first come up with the—when does the State suggest he came up with that?

Deputy Attorney General: It is not unfair to comment when he says anything at the time he talks to the police and 15 months later he says something else. There is no inference to be drawn. I'm simply going to point out that he made the statement and in the interim had the benefit of the ATF report, and that's when the evidence of the two guns is known. He responded during a prior proceeding that there was return gunfire. I was going to add there was some indication that the seed may have been planted, but you will have to review the evidence and see whether or not, in fact it was a relevant statement.

THE COURT: Okay. Go Ahead.

The prosecutor then continued addressing the jury:

Ladies and gentleman, initially that [return gunfire] information was not provided to the police. After the ATF report was made available and known during the investigation, defendant indicated there was some type of return gunfire. However, there is not one scintilla of evidence[,] testimonial or physical[,] suggesting anything like that occurred. No witness saw any such thing.

▮▮▮ In deciding whether the prosecutor improperly commented on the defendant's right to remain silent, we determine " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " [92] In making this determination, we examine the prosecutor's comments in the context of the trial as a whole.[93] Again, given the context, we do not think that Flonnory's argument has merit. It is clear the repeated "15 months" comments were not improper comments on Flonnory's silence, but merely attempts to illustrate the possible inconsistencies in Flonnory's initial statement to the police where he, according to the prosecution, did not mention any return gunfire, and his later testimony at his first trial, testimony that occurred after an ATF report indicated that a revolver had been involved in the shootings. In this case, the passages of the closing arguments of which the defendant complains do not amount to misconduct. The jury would not "naturally and necessarily" take these statements to be a comment on Flonnory's silence. Accordingly, Flonnory's final contentions on appeal have no merit.

**92.** *Shelton v. State,* 744 A.2d 465, 502 (Del. 2000) (citations omitted).

**93.** *Id.*

*Conclusion*

For the foregoing reasons, the judgments of the Superior Court are **AFFIRMED**.